THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND GREENBELT DIVISION

| | | |
|---|---|---|
| Leah Camper | ) | |
| P.O. Box 22 | ) | |
| Pinola, Mississippi 39149 | ) | |
| | ) | |
| and | ) | |
| Atlee Camper | ) | Civil Number_____ |
| P.O. Box 22 | ) | |
| Pinola, Mississippi, 39149 | ) | |
| | ) | |
| **Plaintiffs**, | ) | |
| v. | ) | |
| National Security Agency | ) | |
| 9800 Savage Road, Suite 6272 | ) | |
| Ft. George G. Meade, MD 20755-6000 | ) | |
| | ) | |
| and | ) | |
| Michael S. Rogers, Director of the NSA | ) | |
| 9800 Savage Road, Suite 6272 | ) | |
| Ft. George G. Meade, MD 20755-6000 | ) | |
| | ) | |
| | ) | |
| **Defendants**. | ) | |
| | ) | |

## COMPLAINT FOR NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, COMMON LAW TORT OF INVASION OF PRIVACY, FEDERAL AND STATE PRIVACY ACT VIOLATIONS, DEPRIVATION OF DUE PROCESS AND CONSTITUTIONAL RIGHTS, AND AN AWARD OF INJUNCTIVE RELIEF.

COME NOW the Plaintiffs and hereby complain of the Defendants as follows.

Plaintiffs bring various federal and state law claims premised on numerous violations of

their right to privacy under federal and state law. In addition to the federal and state right

to privacy claims, Plaintiffs also plead herein a *Bivens v. Six Unknown Agents* cause of

action. *See infra* VIII.  Before filing this lawsuit in an attempt to determine whether the

NSA and or it's employees or independent contractors were engaged in the campaign of

harassment and discrimination described herein, Plaintiffs' counsel sent a letter to NSA

in January 2018, advising them of Plaintiffs' claims and asking them to respond. For the

Court's edification, the startling allegations in this complaint are remarkably similar to

the complaints made by the ex-NSA employee, Karen Melton Stewart (See Exhibit A)

who spent 28 years in NSA's employ.

### PARTIES

1.  Plaintiff Leah Camper is a well-educated American citizen who grew up and went to

    school in Michigan. (Hereinafter she will be referred to as Plaintiff Leah).

2.   She currently lives in Mississippi. The allegations made herein concern warrantless

    surveillance and constant harassment that the Plaintiff has endured since applying for

    employment with the CIA in 2003 and meeting with NSA representatives in 2003.

    Ever since applying for the job with the CIA, the Plaintiff has experienced harassment

    and other troubling incidents as detailed herein which she believes the NSA is

    responsible for.

3.  Plaintiff Atlee Camper, is the mother of Leah Camper. (Hereinafter she will be

    referred to as Plaintiff Mrs. Camper).  Plaintiff Mrs. Camper currently resides in

    Pinola, Mississippi with her daughter Leah Camper.  Plaintiff has experienced

    significant emotional and mental challenges from watching the stress and trauma her

    daughter has experienced as a direct result of the campaign of constant harassment

    engaged in or authorized by the defendant.

4.  Defendant NSA is a United States Government agency located in Maryland and is

    responsible for the warrantless surveillance and harassment of Plaintiff Leah. Their

    mission is (a) to lead the U.S. Government in cryptology that encompasses both

Signals Intelligence and Information Assurance products and services, and (b) enables in house Computer Network Operations in order to gain a decision advantage for the Nation and our allies under all circumstances. They have the capability of monitoring every American's activity on a 24-hour basis, whether at home or on the job.

5. Defendant Michael S. Rogers is the Director of the NSA and is responsible for the actions of NSA agents and employees.

6. Plaintiff Leah has contacted a number of government agencies including the NSA and attempted to secure relevant information to explain why this campaign of constant harassment is occurring. Every request for a FOIA has been denied. That is why the Plaintiffs have not been unable to bring this suit earlier.

7. The only entity with knowledge about these criminal activities appears to be the NSA, and their position is that Plaintiff Leah is not entitled to any files in their possession pertaining to her. She received a letter on July 9, 2015 confirming this to be the case. (See Exhibit B & C). She has no remedy left but to pursue this litigation.

**JURISDICTION**

8. 28 U.S.C. § 1332 Diversity Jurisdiction is invoked with respect to all Defendants.

9. 28 U.S.C. § 1331 is invoked with respect to Defendant NSA in connection with Count V, vio Violation, and with respect to Defendant NSA and NSA Agents in Count VI, Deprivation of Due Process Rights under Amendments V and XIV of the U.S. Constitution.

10. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction

that they form part of the same case or controversy under Article III of the United
States Constitution." Thus this Court has supplemental jurisdiction over the Plaintiffs'
state claims (i.e., Counts V-VI) alleged herein.

## VENUE

11. Venue is proper under 28 U.S.C. 1391(b) because Defendant is a federal agency
headquartered in Fort Meade, Maryland which is located in this judicial district.

## STATEMENT OF FACTS

12. In 1996 and 1997 Plaintiff Leah worked as a Defense Contractor for Hughes
Information Systems (now Raytheon) where she received a Single Scope Background
Investigation clearance, which is a type of United States Government Top Secret
clearance.

13. Plaintiff Leah applied for a position with the CIA around May 2003. Ever since
applying for this job, the Plaintiffs have experienced constant harassment and other
troubling incidents for which they believe NSA officials are responsible. Plaintiff
Leah was never subsequently contacted to interview for the job, and in fact never
heard from the CIA in any respect i.e. "your application was denied." Plaintiff Leah
never thought much about this incident or gave it a second thought until suspicious
activity (for example unexplained break ins) started to occur, along with her being
accosted by total strangers and being asked personal questions about herself.

14. Plaintiff Leah has experienced strange random encounters that she has no explanation
for. For example, in 2009 while at the St. Mary's Hospital in Livonia, Michigan, a
stranger approached her and asked her "who are you waiting for?" She was on her

way to the elevator and he persisted to ask her opinions on politics, politicians, and the U.S. Senate Intelligence Committee.

15. While Plaintiff Leah was at the University of Michigan Hospital in Ann Arbor in 2005, she was approached by a man who started reciting to her his knowledge of her attendance at the University of Detroit. In both incidences Plaintiff Leah did not know who these individuals were, why they knew information about her, and why they were approaching her and engaging her in conversation.

16. In late 2008, Plaintiff Leah asked the staff of Congressman John Conyers to "check on" the CIA, and she was simply told that the CIA doesn't engage in that type of criminal activity. The Congressman's office made no independent investigation on her behalf, however.

17. Plaintiff Leah also contacted the office of Senator Carl Levin (MI) (now retired), who was on the Senate Intelligence and Armed Services Committee. He contacted the CIA on her behalf, and the CIA denied any wrongdoing. In a response letter from the CIA to Senator Carl Levin, the CIA claimed they were not monitoring Plaintiff Leah. (See Exhibit D, E, F).

18. Thereafter, Plaintiff Leah's information was hacked, which enabled U.S. Office of Personnel Management to contact her directly. When Plaintiff Leah contacted a local FBI office in Mississippi, she was told her job information was "classified," despite the fact that Plaintiff Leah has never been a U.S. government employee. (See Exhibit G).

19. In the fall of 2003, Plaintiff Leah first met with a Career Representative of Defendant NSA at the University of Detroit Mercy in Detroit, Michigan. The meeting was

coordinated through a graduate professor who recommended Plaintiff Leah for a computer position with Defendant NSA. Plaintiff Leah was then introduced to Mona Martin, an NSA recruiter. Since this meeting, Plaintiff Leah has experienced constant harassment and other troubling incidents. She believes that the NSA officials are responsible for this criminal activity. (See Exhibit H).

20. Strange incidents have also occurred ever since Plaintiff Leah applied for a job with the CIA in 2003 and met with NSA officials in 2003. One time while Plaintiff Leah was on her computer, she was automatically re-directed to NSA's website. Now, when she turns her computer on the screen often looks different than the last time she was on. Plaintiff Leah also believes that some of her family members have been contacted by the NSA officials and agents based on comments she has heard them say. For example, her cousin Fred Burton randomly asked her, "if she was ready to go to Afghanistan." Though this may be true however, she knows family members are scared to come forth as they have expressed they do not want to get involved in the case. (See Exhibit H).

21. Defendant NSA sent Plaintiff Leah on a non-existent interview with Verizon at an empty network operations center in Southfield, Michigan. Plaintiff Leah was asked about not meeting deadlines during her former job at Sprint. Plaintiff Leah was also sent on a non-existent interview with the Detroit Symphony Orchestra and a phone interview with the contracting company Eloyalty, a Boston based company. Plaintiff Leah was asked to fill out surveys for non-existent jobs.

22. Defendant NSA interfered with and attempted to manipulate the sale of Plaintiff Mrs. Camper's home in Mississippi, after stating they "wanted to destroy her," by sending

military officers to the home to pretend they were interested in buying it, and getting

information from both Plaintiffs. This began in early 2017. Plaintiff Mrs. Camper's

door was kicked in at 141 Heed Neely Road, Braxton MS, for no reason at all;

Plaintiff Leah filed a police report citing this criminal activity. (See Exhibit H).

23. In 2004, Plaintiff Leah was confronted and temporarily blocked by a man who

refused to identify himself while leaving the local Bally Health Club. Plaintiff Leah

immediately went to her car and discovered it had been broken into and searched and

the door had actually been left open.

24. For the past fourteen years, Plaintiff Leah's activities have been monitored by NSA

officials, and as a result she believes she has in effect been held hostage by Defendant

NSA. Plaintiff Leah has been followed around the United States, including

Tennessee, Alabama, California, Texas, Mississippi, Michigan, and Washington,

D.C. (See Exhibit H).

25. Plaintiff Leah has been contacted by an individual on Facebook and was told that if

she didn't agree to work for the NSA, she would never work for anyone else again.

They have interfered with her chances for employment by engaging in surveillance

and constant harassment. However, Plaintiff Leah has never been offered a job with

either CIA or NSA, so her once promising U.S. Government employment options

have vanished.

26. Defendants have harassed both Plaintiffs by interfering with or destroying their

personal property. For example, Plaintiff Leah cannot use her computer, television, or

tablet without Defendants' interference. Her passwords to her computer, bank

accounts, and phones have all been changed without her knowledge or consent. Also,

Plaintiff Leah's television, tablet, checks, and a gun; along with her niece's karaoke

machine were all either destroyed or stolen by individuals working for the

Defendants.

27. There are three incidences where keys belonging to both Plaintiffs have been stolen.

One incident occurred while Plaintiff Leah was staying at a hotel near Kalamazoo,

Michigan. Keys to her home in Pinola Michigan were on the vanity in the hotel

bathroom, and were stolen. Another incident occurred when Plaintiff Mrs. Camper

went to a Home Depot to have copies made of a set of keys to a home located in

Gulfport, Mississippi which they inherited. When she returned home, the new keys

were missing.

28. Plaintiff Leah then went to Lowes to have another set of keys made and she watched

the employee making her key put a copy into his apron. In addition, Plaintiff Leah has

even filed a police report when her gun was stolen from its bag in her home. (See

Exhibit I, J).

29. Apparently Plaintiff Leah can no longer leave the United States. She was strip-

searched at the Detroit-Canadian border in 2010 and was told not to return to the

border or she would be incarcerated. At no time was Plaintiff Leah informed what the

criminal charges would be to justify her incarceration.

30. Plaintiff Leah has been approached and insulted by numerous individuals with

military backgrounds and harassed about bills, bathroom activities, health issues, and

weight control. An employee of Defendant NSA told Plaintiff Leah she "needed to

lose weight." Plaintiff Leah was also asked if she was a member of ISIS, the Taliban,

or if she posed a threat to this country for whatever reason.

31. On January 12, 2018, our office sent Attorney Gerstell at the National Security

   Agency a letter concerning the aforementioned harassment and a possible lawsuit, in

   addition to asking for verification from the NSA of any record of Plaintiff Leah or

   surveillance of her on file. We still have not received anything back at this time. (See

   Exhibit K).

### COUNT I: NEGLIGENCE AGAINST DEFENDANT NSA

32. Plaintiff Leah repeats and realleges paragraphs 1 through 31 as if fully cited herein.

33. At all relevant times herein, Defendant NSA never had a valid basis for believing

   Plaintiff Leah to be a security risk, but that did not stop NSA officials from

   continuing to monitor Plaintiff Leah's activities and spread that rumor.  In such a

   situation NSA officials are charged by law with closing down any further

   investigation by the individuals unless new evidence comes to their attention. They

   nonetheless decided to continue to engage in harassment and surveillance of Plaintiff

   Leah. They engaged in such conduct in reckless disregard of Plaintiff Leah's right not

   to have her privacy invaded.

34. Due to the NSA's failure to properly investigate Plaintiff Leah, and clear her of any

   potential charges, for example, being a security risk, combined with the overzealous

   and harassing nature of Defendants' agents in surveillance of Plaintiff Leah, she has

   been injured psychologically, financially, and in her reputation.

35. For example, NSA approached Plaintiff Leah's friends and family members and

   enlisted them in engaging in harassment of Plaintiff Leah. Defendants also interfered

   with Plaintiff Leah's employment efforts by sending her on non-existent job

interviews, destroying her computers, tablet, and telephone, and making her feel

unsafe even in her own house.

WHEREFORE, Plaintiff Leah requests that this Court issue a restraining order preventing

the Defendant NSA agents from continuing their surveillance of her and her family

members and intimidating her and portraying her as a security risk to local law

enforcement authorities. Plaintiff Leah further requests damages in the amount of not less

than $500,000 dollars for the psychological and emotional trauma she has suffered and

for not less than $500,000 dollars for lost wages.

### COUNT II:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT NSA AND ITS EMPLOYEES, AGENTS, AND INDEPENDENT CONTRACTORS.

36. Plaintiffs repeat and reallege paragraphs 1 through 35 as if fully cited herein.

37. As a result of the aforementioned harassment, both Plaintiffs have been

psychologically wounded and traumatized. They feel constantly threatened and afraid

for of their lives, specifically Plaintiff Leah.  She has not been able to access the

treatment and medication such psychological harm requires, because she cannot keep

a job which would either provide medical insurance or provide adequate

compensation for her to afford such treatment. Her sleep is irregular at best.

38. Plaintiff Leah has been harassed by strangers who would tell her that she needed to

lose weight and ask her about sexual issues, and even asked if she was ready to go to

Afghanistan. She was also trailed around the country and had her niece's karaoke

machine stolen during a break in which Plaintiff Leah believes NSA employees or

independent contracts were responsible for.

39. Plaintiff Mrs. Camper's home was broken into which has caused her fear of future intrusions and she believes her privacy has been taken from her.  Plaintiff Mrs. Camper is emotionally suffering from watching the distress and trauma her daughter has been experiencing based on he illegal actions of the NSA and its employees and contractors.

40. Plaintiff Leah's car was also searched in a local health club parking lot. As a result of this harassing treatment and interference with her employment efforts, Plaintiff Leah has experienced extreme emotional distress i.e. was her car breaks disengaged?

41. This is not a figment of either of the Plaintiffs' imagination i.e. this campaign of constant harassment and intimidation and stalking is routine surveillance work for the NSA as the attached affidavit of Karen Stewart makes clear. Although the allegations contained herein are difficult to believe for the average American, apparently this is standard operating procedure that the NSA employees and contractors have engaged in with respect to harassment and shadowing of the plaintiff. Based on the attached affidavit by Ms. Stewart it appears that just like Plaintiff Leah, she has been slandered and stalked by NSA personnel (some of them still wearing their badges), and harassed. As a result, Ms. Stewart's mental and physical health has been damaged significantly. That is the identical claim made by the Plaintiff Leah herein.

42. Ms. Stewart claims that she was secretly and illegally deprived of her constitutional and civil rights. That is identical to the claim made herein by Plaintiff Leah.  Ms. Stewart also claims she has been placed on a fabricated terrorist watch list, and accused of secret crimes. Just like Plaintiff Leah, Ms. Stewart believes the NSA officials in charge of this campaign of harassment and intimidation, view her as being

a secret threat to the country. Ms. Stewart references the fact, as does the Plaintiff

Leah herein, that she has been victimized by local law enforcement agencies located

in Florida who admittedly refuse to investigate her claims so she will have no

evidence as to the criminal activity that is being conducted by federal authorities.

43. Ms. Stewart claims that the NSA officials have made unfounded and reckless

accusation against her and complied a dossier of false documentation which NSA has

shared with multiple other law enforcement agencies. That may be the reason why

Ms. Stewart was put on this bogus terrorist watch-list, which based upon information

and belief is still being maintained by the agency. Ms. Stewart also claims she has

been the victim of identity theft, which is an additional claim made by Plaintiff Leah.

Ms. Stewart also states in her affidavit that she had met another victim of the NSA

campaign of vicious slander and stalking, who has been similarly targeted by NSA

agents. Those agents did not allow him to do his job and send out valuable

intelligence reports on the threat that turned into 9/11.

44. Much like the Plaintiffs, Ms. Stewart accuses NSA officials of assaulting her in her

home and she also reports unusual and unexplained occurrences in her home, much

like the activity complained of herein. Ms. Stewart claims there is a secret section of

the naval security group in Pensacola, Florida, and they are one set photo-stalkers.

They work hand in hand with the local sheriff's office to facilitate the illegal stalking

harassment initiated by the NSA. Just like the plaintiff claims herein, when Ms.

Stewart would complain to local law enforcement authorities, they ignored her,

belittled her, and attempted to discredit any of the criminal activity she reported. All

of these local law enforcement agencies have refused to write up the criminal charges

so she would have no corroborating evidence of their criminal complicity.

45. Mrs. Stewart also accused GSA operatives of a physical attack which occurred at her

house in addition to NSA officials trying to convince people she was mentally ill.

These NSA officials even had her evaluated by a state psychologist. This criminal

activity mirrors the complaints made herein. The state psychologist, however, sent

Ms. Stewart home saying "she never should have been Baker-acted, you don't belong

here." For the court's edification the Baker legislation has been used by NSA officials

to commit a disgruntled employee or civilian to a mental institution.  The Baker act

can be used to commit a civilian to a mental institution with very little due process

afforded to the victim.

WHEREFORE, Plaintiff Leah and Plaintiff Mrs. Camper request that this court issue a

restraining order preventing the Defendants from continuing their surveillance and

campaign of harassment. Both Plaintiffs further request damages in the amount of not

less than $500,000 dollars for the psychological and emotional trauma she has suffered.

### COUNT III: COMMON LAW TORT OF INVASION OF PRIVACY AGAINST DEFENDANT NSA AND ITS EMPLOYEES, AGENTS, AND INDEPENDENT CONTRACTORS.

46.  Plaintiffs repeat and reallege paragraphs 1 through 45 as if fully cited herein.

47. Plaintiffs have detailed in paragraphs 1 through 45 how Defendants are monitoring

Plaintiff Leah's daily activities and engaging in a pattern of constant harassment

designed to inflict emotional distress on both Plaintiffs and their family.

48. For example, Defendants have searched Plaintiff Mrs. Camper's home and Plaintiff

Leah's car, stolen or damaged their property and the property of Plaintiff Leah's niece

(karaoke machine), and sent Plaintiff Leah on fake job interviews, and enlisted her friends and family to engage in harassment as well. Based upon this activity, which is still occurring today, Defendants have repeatedly invaded the privacy of both Plaintiffs. The NSA and its officials have refused to have any direct contact with the Plaintiff Leah or give her an interview and an opportunity to clear up any potential charges of her being a security risk.

WHEREFORE, Plaintiff Leah and Plaintiff Mrs. Camper each seek a monetary award of $500,000 dollars for such conduct and the emotional distress they have each suffered and continue to suffer.

### COUNT IV:  FEDERAL PRIVACY ACT 5 USC § 552a

49. Plaintiff Leah repeats and realleges paragraphs 1 through 48 as if fully cited herein.

50. The Federal Privacy Act safeguards the public from "unwarranted collection, maintenance, use, and dissemination of personal information contained in agency records." *See Cloonan v. Holder,* 768 F. Supp. 2d 154, 161 (D.D.C. 2011). An individual who is concerned that agency records are accurate has the right to participate in some sort of agency review to ensure that his records have been accurately complied. *Id*.

51. To ensure this goal is accomplished, the Act requires agencies to comply with detailed instructions for managing their records, and it also provides various sorts of civil relief to individuals aggravated by failures on the government's part to comply with said requirements. *Henke v. Dep't of Commerce*, 83 F. 3d 1453, 1456 (D.C.Cir. 1996).

52. § E(7) of the Privacy Act specifically provides that a government agency like the NSA has an obligation "to maintain no record describing how an individual exercises his rights guaranteed by the first amendment *unless within the scope of an authorized law-enforcement activity.*" Plaintiff Leah is unaware of any unusual activity which these agencies could deem to warrant law-enforcement activity against her.

53. As recited in paragraphs 1 through 47, Plaintiff Leah believes that various NSA officials have made up false records. Plaintiff Leah believes that the records the NSA and the Mississippian FBI maintains contain damaging and false information. Unfortunately, the agents that are engaging in surveillance of Plaintiff Leah have been: (a) following and harassing Plaintiff Leah without giving her an opportunity to defend herself, and (b) acting outside the scope of any authorized law-enforcement activity.

WHEREFORE, Plaintiff Leah requests that an order be entered herein allowing her attorneys to review whatever files the NSA currently maintains of her activities, and that any and all false and defamatory material contained therein be deleted, consistent with the protections afforded to Plaintiff Leah by the Federal Privacy Act.

## COUNT V: COMMON LAW TORT OF INVASION OF PRIVACY UNDER MICHIGAN LAW AGAINST DEFENDANTS.

54. Plaintiff Leah repeats and realleges paragraphs 1 through 53 as if fully cited herein.

55. Michigan recognizes the state common-law tort claim of invasion of privacy on the basis of "intrusion upon the plaintiff's seclusion or solitude, or into his private affairs." *See Tobin v. Civil Service Comm.*, 416 Mich. 661 (1982).

56. Defendants have intruded upon Plaintiff Leah's seclusion by: (a) listening to her activities through her cell phone; (b) interfering with her usage of her phone, tablet,

and computer; (c) searching her car and home without a warrant; (d) stealing her

property, including a gun and some of her niece's possessions; and (e) following

Plaintiff Leah around the country and approaching her during her personal activities.

Defendants have further intruded upon Plaintiff Leah's seclusion by contacting her

friends and family and giving them information that would lead to them making

"nasty comments" to Plaintiff Leah.

WHEREFORE, Plaintiff Leah seeks injunctive relief in the form of a court order barring

the continuing surveillance of Plaintiff Leah.

### COUNT VI: COMMON LAW TORT OF INVASION OF PRIVACY UNDER MISSISSIPPI LAW AGAINST DEFENDANTS.

57. Plaintiffs repeat and reallege paragraphs 1 through 56 as if fully cited herein.

58. Mississippi recognizes the state common-law tort claim of invasion of privacy, on the

basis of "intentional intrusion upon the solitude or seclusion of another." *Candebat v.*

*Flanagan,* 487 So. 2d 207 (1986), *citing Deaton v. Delta Democrat Publishing Co.*

326 So. 2d 471, 473 (Miss. 1976). Defendants have intruded upon the solitude and

seclusion of both Plaintiffs and have therefore invaded Plaintiffs' privacy in the state

of Mississippi as a result.

59. As stated in Count V, Defendants have intruded upon Plaintiff Leah's seclusion by:

(a) listening to her activities through her cell phone; (b) interfering with her usage of

her phone, tablet, and computer; (c) searching her car and home without a warrant;

(d) stealing her property, including a gun and some of her niece's possessions; and (e)

following Plaintiff Leah around the country and approaching her during her personal

activities. Defendants have further intruded upon Plaintiff Leah's seclusion by

contacting her friends and family and giving them information that would lead to them making "nasty comments" to Plaintiff Leah.

60. Defendants have also intruded upon Plaintiff Mrs. Camper's seclusion by: (a) sending military officers to the location where she was selling her home, where they tried to obtain information about her and Plaintiff Leah; and (b) when NSA officials broke into her home.

WHEREFORE, Plaintiff Leah and Plaintiff Mrs. Camper each seek injunctive relief in the form of a court order barring the continuing surveillance of each Plaintiffs.

### COUNT VII: DEPRIVATION OF PROCEDURAL DUE PROCESS GUARANTEED BY THE U.S. CONSTITUTION AGAINST DEFENDANTS.

61. Plaintiff Leah repeats and realleges paragraphs 1 through 60 as if fully cited herein.

62. As already described herein, various liberty interests which are guaranteed to the Plaintiff Leah under the U.S. Constitution and the due process clauses under the 5th and 14th amendments have been violated by the NSA and agents and employees.

63. Procedural due process imposes constraints on government decisions like the one made by NSA officials to start monitoring Plaintiff Leah's activities as a result of her simply applying for a job. That decision had an irreparable effect on Plaintiff Leah because her right to privacy was immediately invaded without her being afforded any procedural due process. For example, Plaintiff Leah had a right to life, liberty, and the pursuit of happiness and not to have her privacy invaded by Defendants named herein for twenty-four hours each day. Yet, without affording Plaintiff Leah an opportunity to show why she was not a threat or security risk to this country, they continue to engage in criminal activity like constant harassment and surveillance.

64. As this Court knows, due process is not a technical concept with a fixed content unrelated to times and circumstances. Due process is a flexible concept and calls for such procedural protections as the particular situation demands.

65. Thus, the Defendants named herein have violated Plaintiff Leah's constitutional interest in being able to pursue life, liberty, and happiness in terms of daily family life free from government surveillance and being able to hold permanent employment without interference from Defendants.

WHEREFORE, Plaintiff Leah hereby requests entry of a judgment of $500,000 dollars against Defendants for violating her right to privacy by engaging in a 24-hour surveillance program of Plaintiff Leah's activities, which included destruction and conversion of Plaintiff Leah's property, and harassment. Defendants violated her constitutional liberty interest because they never afforded her a meaningful opportunity to show why she did not pose a security threat to those agencies.

**COUNT VIII: VIOLATION OF CONSTITUTIONAL RIGHTS BY NSA AGENTS UNDER *BIVENS V. SIX UNKNOWN AGENTS,* 403 U.S. 388 (1971).**

66. Plaintiffs repeat and reallege paragraphs 1 through 65 as if fully cited herein.

67. Plaintiff Leah also brings this action under *Bivens v. Six Unknown Agents,* 403 U.S. 388 (1971) and its progeny, which authorizes filing lawsuits against federal officers in their individual capacities for violating a U.S. citizen's constitutional right. *See Ali v. Cassanta*, 2007 U.S. Dist. LEXIS 37298 (D. Conn. May 21, 2007). To state a claim under *Bivens*, a plaintiff must allege that she: (1) was deprived of a constitutional right; (2) by a federal agent; (3) acting under color of federal authority. *Id.* A Bivens claim will lie when there is no adequate remedy under state or federal law. *Minneci v. Pollard,* 132 S.Ct. 617 (2012).

68. As already pled herein, Plaintiff Leah has the constitutional rights to: (a) life, liberty, and the pursuit of happiness in terms of living her daily life free from government surveillance and being able to hold permanent employment without interference from federal officials; (b) travel free from unreasonable burdens within the U.S.; (c) freedom from being falsely stigmatized as an individual associated with these Defendants; and (d) freedom from family members being harassed as well.

69. Plaintiff Leah was deprived of the aforementioned rights by the campaign of constant harassment and surveillance, described herein, which included Defendants stalking her, stealing some of her personal electronic devices, talking to her family and friends, harassing her family and friends and destroying or stealing their property. For example, NSA employees and or contractors have broken down Plaintiff Mrs. Camper's door. These activities have happened at both Plaintiffs' residences and other public locations, in addition to Defendants following Plaintiff Leah around in several different states.

70. Because of this campaign of constant harassment and threatening behavior, Plaintiff Leah has not been able to pursue employment or enjoy her family life. She has been sent on non-existent job interviews and Defendants have interfered with her means of communication i.e. her personal electronic devices. This has caused Plaintiff Leah to be unable to receive sufficient compensation through employment. She cannot travel without the fear or actual occurrence of being followed and/or approached by strange young men, or local law enforcement officials.

71. Defendants are responsible for this deprivation because NSA officials including Defendant Rogers have personally authorized or approved employees or contractors

engaging in the activities described herein. For example, the NSA employees or

contractors have personally spoken with both Plaintiff's friends and family and

engaged in the above activities, including breaking down the down of Plaintiff Mrs.

Camper.

72. At all relevant times herein, the Defendant Agents were acting under the color of

federal authority. They represented to both Plaintiffs, their family, and their friends,

that they were duly authorized to speak on behalf of and working under the aegis of

the U.S. government which Plaintiff Leah believed to be the NSA.

WHEREFORE, Plaintiff Leah and Plaintiff Mrs. Camper hereby each request entry of a

judgment of $500,000 dollars for violating their respective constitutional rights against

defendant NSA and its director Mr. Rogers because the agency and the director are both

responsible for the conduct of NSA employees, agents, and contractors.

/s *Martin F. McMahon*
Attorney for Plaintiff
Martin F. McMahon. Esq.
Martin F. McMahon & Associates
1150 Connecticut Avenue NW
Suite 900
Washington D.C., 20036
Federal Court Maryland Bar No. 02592

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims so triable.


/s *Martin F. McMahon*
Martin F. McMahon & Associates
1150 Connecticut Avenue NW
Suite 900
Washington D.C., 20036
Federal Court Maryland Bar No. 02592