UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEAH CAMPER, *et al.*          )
                              )
        *Plaintiff,*          )
                              )
        v.                    )          Civil Action No. PWG-18-1794
                              )
NATIONAL SECURITY AGENCY. *et al.*  )
                              )
        *Defendants,*         )
_____ )

## DECLARATION OF STEVEN E. THOMPSON

I, STEVEN E.THOMPSON, hereby declare and state:

1.      I am the Chief of Policy, Information, Performance, and Exports[1] at the National

Security Agency ("NSA" or "Agency"). I have been employed with NSA since 1983 and have

served in this position since 2017. In this position I am responsible for oversight of NSA's

Freedom of Information Act/Privacy Act Office ("NSA FOIA Office"). This office has primary

responsibility for responding to requests for NSA records made pursuant to the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974 ("PA"), 5 U.S.C. §

552a. Prior to this assignment, I have held various leadership positions throughout the Agency

and elsewhere in the Executive Branch, and have a detailed understanding of NSA's operations,

management processes, and resources. My prior senior and supervisory positions include serving

as the Deputy Chief of Staff for Policy and Corporate Issues in the Agency's Signals Intelligence

---

[1] This position was formerly known as the Associate Director for Policy and Records and as the Chief of Strategy, Plans & Policy.

1

Directorate, Deputy Special United States Liaison Officer London, Director for Cybersecurity at the National Security Council, and Director for Strategic Foundations in the Joint Interagency Cyber Task Force.

2.      I am also a TOP SECRET original classification authority pursuant to Section 1.3 of Executive Order ("E.O.") 13526, dated 29 December 2009 (75 Fed. Reg. 707). It is my responsibility to assert the applicable FOIA/PA exemptions for NSA information in the course of litigation.

3.      Through the exercise of my official duties, I have become familiar with the current litigation, which arose out of a complaint filed on behalf of Ms. Leah Camper (hereinafter "the Plaintiff") alleging that, among other things, the Agency committed a violation of the Privacy Act by retaining false information about the Plaintiff. The purpose of this declaration is to explain how the NSA properly processed the Plaintiff's prior FOIA and PA requests and provided all non-exempt portions of responsive records to the Plaintiff. Additionally, this declaration describes a new search that NSA performed in order to verify that it properly located and produced all non-exempt PA records about the Plaintiff that the Agency had in its possession as of December 2018.

4.      In order to provide the necessary context for the discussion that follows, I will first describe NSA's origin and missions.

## I.   NSA's ORIGIN AND MISSIONS

5.      The NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense ("DoD") under the direction, authority, and control of the Secretary of Defense. NSA has two primary missions: (1) to collect, process, analyze, produce, and disseminate signals intelligence (SIGINT) information for foreign

2

intelligence and counterintelligence purposes to provide support for national and departmental requirements and for the conduct of military operations; and (2) to conduct information assurance/cybersecurity activities.

6.  NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign signals. In performing its SIGINT mission, NSA exploits foreign signals to obtain intelligence information necessary to the national defense, national security, and/or the conduct of foreign affairs. The technological infrastructure that supports NSA's SIGINT collection network has taken years to develop at a cost of billions of dollars and significant human effort. It relies on sophisticated collection and processing technologies designed to keep pace with challenging new technological developments.

## II.   IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

7.  There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary for the national security of the United States. SIGINT information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President, the President's National Security Advisor, the Director of National Intelligence, the Secretaries of Defense, State, Treasury, and Commerce, U.S. ambassadors serving in posts abroad, the Joint Chiefs of Staff, and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments including, among others, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), the Departments of the Army, Navy, and Air Force, and various intelligence components of DoD. Information provided by NSA in a classified setting to the military and other government agencies and officials within the

3

Intelligence Community ("IC") is relevant to a wide range of important issues including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This sensitive information is often critical to the conduct of U.S. foreign policy and of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

8.      NSA's ability to produce SIGINT depends on its access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

9.      The subset of SIGINT information obtained from intercepted foreign communications is called communications intelligence ("COMINT"). A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because the ability to exploit foreign communications is fragile. Disclosure of the identity of the targets, the ability to exploit those targets, or the vulnerability of particular foreign communications would encourage countermeasures by the targets of NSA's COMINT efforts. Disclosure of even a single intercepted communication holds the potential to reveal the intelligence collection techniques that are applied against targets around the world. Once alerted, COMINT targets may change the way they communicate, which could inhibit access to the targets' communications and, therefore, deny the United States access to information crucial to the defense of the United States both at home and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost

4

unless and until NSA can establish new and equivalent exploitation of that target's signals. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the IC must operate without the information the communications provided. Such losses are extremely harmful to the national security of the United States.

10.      Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed statutes to protect NSA's SIGINT efforts from damage by disclosure. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. These statutes are: Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605); Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024); and 18 U.S.C. § 798. Under these three statutes, NSA is specifically authorized to protect certain information concerning its activities and its intelligence sources and methods from public disclosure.

## III.   PLAINTIFF'S FOIA & PA REQUESTS

11.      On June 10, 2015, the Plaintiff submitted a FOIA/PA request via email to NSA's FOIA Office. In this request, the Plaintiff stated that she "need[ed] to know if [she] was being investigated by the NSA." A true and correct copy of this email is attached as Exhibit A to my declaration. NSA interpreted the Plaintiff's request as seeking NSA intelligence records on herself.

12.      NSA responded to the Plaintiff's request by letter dated July 9, 2015. This letter informed the Plaintiff that her request would be assigned case number 81484 and explained that NSA was interpreting her request as seeking intelligence records. This letter further explained

that the fact of the existence or nonexistence of responsive intelligence records was currently and properly classified in accordance with Executive Order 13526, and was thus exempt from disclosure based upon Exemption 1 of the FOIA (5 U.S.C. § 552(b)(1)) and Exemption (k)(1) of the PA (5 U.S.C. § 552a(k)(1)). NSA's letter also provided that the existence or nonexistence of the same information was also protected from release by statute, and thus was exempt from release based upon Exemption 3 of the FOIA (5 U.S.C. § 552(b)(3)). Finally, the letter informed the Plaintiff of her right to administratively appeal the Agency's determination. A true and correct copy of this letter is attached as Exhibit B to my declaration.

13.     In a letter dated July 20, 2015, the Plaintiff administratively appealed NSA's initial response. The basis of the Plaintiff's appeal was "I simply want to know exactly what your agency wants with me." Within this appeal, the Plaintiff also indicated that "I want to submit a privacy act request" and she provided her social security number and signature. A true and correct copy of this letter is attached as Exhibit C to my declaration. The NSA interpreted this letter as serving as both an appeal of NSA's initial denial of her FOIA/PA request as well as a request to initiate a new PA request for information about herself. Thereafter, NSA handled the FOIA/PA appeal and the new PA request separately.

14.     In response to the Plaintiff's July 20, 2015 letter, NSA sent the Plaintiff a letter, dated November 24, 2015, informing her that NSA received her appeal of FOIA/PA case 81484 on July 28, 2015, and that it would begin processing her appeal as soon as possible, despite a significant backlog. A true and correct copy of this document is attached as Exhibit D to my declaration.

15.     By letter dated February 9, 2017, NSA responded to the Plaintiff's appeal of case 81484. This letter explained that the Agency reviewed both her initial request and the Agency's

6

initial response to her, and determined that the Agency's initial response was correct. This letter explained that this was because the Agency was still interpreting Ms. Camper's request to be seeking intelligence records about herself. A true and correct copy of this letter is attached as Exhibit E to my declaration.

16.     The Agency has not heard anything further from Ms. Camper about case 81484 since the transmission of this February 9, 2017 letter.

17.     Separately, NSA sent the Plaintiff a letter dated June 6, 2016, indicating that it treated her July 20, 2015 letter as a new PA request for all records that NSA maintains about her, and it assigned this new request case number 84525. This letter also explained that the Agency had already conducted a search for responsive material in its "[p]ersonnel management files . . . which include applicant, personnel, security, medical, and training" records. This search produced no records about her. Specifically, the letter indicated, "our records do not reflect that you have ever been affiliated with this agency." A true and correct copy of this letter is attached as Exhibit F to my declaration.

18.     In response, the Plaintiff sent NSA a letter dated June 27, 2016, discussing her PA request and indicating that she visited NSA on May 9, 2016. Although the intent of this letter was not clear, the Agency interpreted the letter to be an appeal of the NSA's June 6, 2016 letter. A true and correct copy of this letter is attached as Exhibit G to my declaration.

19.     Accordingly, NSA sent the Plaintiff a letter dated July 15, 2016 indicating that it received her June 27, 2016 letter and was accepting it as an appeal of the Agency's denial of her PA request. A true and correct copy of this letter is attached as Exhibit H to my declaration.

20.     In response to this appeal, the Agency performed another search of the Agency's Security and HR files for PA records about the Plaintiff. During this search, the Agency located

7

eight records that had been generated by the Agency since the Agency preformed its prior PA search. These records were created as a result of the Plaintiff's May 9, 2016 visit to NSA's headquarters. When the Plaintiff arrived at NSA on May 9, 2016, she did not have the proper authorization or credentials to enter the property and, pursuant to standard practice, NSA Police generated records regarding this unauthorized visit.

21.    NSA responded to the Plaintiff's appeal via letter dated November 29, 2017. This letter explained that NSA conducted an additional search and located three documents that it enclosed with the letter. This letter and the three enclosed documents that were produced to the Plaintiff are attached to my declaration as Exhibit I. The three documents that were produced are: (1) an NSA Police report documenting the NSA Police's interaction with the Plaintiff; (2) a Memorandum detailing statements that the Plaintiff made during her visit; and (3) a photo of the Plaintiff that resulted from NSA Police's search of the National Crime Information Center (NCIC) database. These documents were produced with redactions of material protected from disclosure pursuant to the second, third, sixth and seventh exemptions of the FOIA (5 U.S.C. § 552(b)(2), (b)(3), (b)(6), and (b)(7)), and exemption (k)(2) of the PA (5 U.S.C. § 552a(k)(2)).[2] Additionally, five documents were withheld in full that were determined to be protected from release pursuant to these same exemptions.

22.    While reviewing this production for the drafting of this declaration, NSA reprocessed both the produced and withheld documents to ensure that the Agency properly released all non-exempt information to the Plaintiff. NSA determined that the same three documents referenced in the preceding paragraph could be produced with less information

---

[2] Please note that NSA's November 29, 2017 letter inadvertently listed 5 U.S.C. 552(b)(5) as an exemption applied to the three records produced in part as opposed to listing 5 U.S.C. 552(b)(6). The Fifth exemption was only applied to the documents withheld in full from this production.

redacted. The transmittal letter and the three reprocessed documents are attached to my declaration as Exhibit J. The remaining redactions protect information pursuant to the third and seventh exemptions of the FOIA (5 U.S.C. § 552(b)(3), and (b)(7)), and exemption (k)(2) of the PA (5 U.S.C. § 552a(k)(2)).

23.     Additionally, the Agency determined that the five documents previously withheld in full must continue to be withheld in full pursuant to the third, fifth, and seventh exemptions of the FOIA (5 U.S.C. § 552(b)(3), (b)(5) and (b)(7)), and exemption (k)(2) of the PA (5 U.S.C. § 552a(k)(2)). Each of these exemptions and their application to the withheld material will be explained in detail below.

## IV.   NSA's *GLOMAR* DETERMINATION IN FOIA/PA CASE 81484

24.     NSA interpreted Plaintiff's initial FOIA/PA request as one seeking intelligence records about herself. To the extent Plaintiff seeks intelligence information, NSA's response is to state that it cannot confirm or deny publicly in any case whether or not it has such records, as doing so would reveal whether or not NSA engaged in certain, or any, intelligence activities, and/or did or did not target individual communications for collection.[3] As a result, NSA properly asserted a "*Glomar*" response pursuant to FOIA exemption 1 and 3 in response to Plaintiff's initial FOIA/PA request.

### a.  Information About NSA SIGINT Activities is Classified and Thus Falls Under FOIA Exemption 1

25.     Title 5, Section 552(b)(1) of the U.S. Code provides that the FOIA does not require the release of matters that are specifically authorized—under criteria established by an

---

[3] A decision neither to confirm nor deny the existence of information requested pursuant to the FOIA is commonly known as a "*Glomar*" response *See Phillipi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (dealing with request for records regarding the ship *Glomar Explorer*).

Executive Order—to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order. The current Executive Order that establishes such criteria is E.O. 13526.

26.     Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. The categories of classified information at issue here are found in Section 1.4(c), which includes intelligence activities (including covert action), intelligence sources and methods, or cryptology. Acknowledgment of the existence or nonexistence of operational intelligence information concerning the who, what, when, and how of NSA's SIGINT collection efforts would reveal information that is currently and properly classified as set forth in Sections 1.4(c) and (g) of E.O. 13526.

27.     Confirming the existence or nonexistence of responsive records would disclose information that is currently and properly classified TOP SECRET pursuant to Section 1.2(a)(1) of E.O. 13526 because such a positive or negative response reasonably could be expected to cause exceptionally grave damage to national security. Any disclosure of this information could reasonably be expected to harm national security because it would reveal NSA capabilities, activities, and intelligence priorities, which in turn could inhibit SIGINT collection and affect NSA's ability to counter threats to the national security of the United States.

28.     Acknowledging the existence or nonexistence of responsive records on particular individuals or organizations that may be subject to surveillance would provide our adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be susceptible to NSA detection. Confirmation by NSA that a person's activities are not of foreign intelligence interest or that NSA is unsuccessful in collecting foreign

10

intelligence information on their activities on a case-by-case basis would allow our adversaries to accumulate information and draw conclusions about NSA's technical capabilities, sources, and methods. For example, if NSA were to admit publicly in response to a FOIA request that no information about Persons X or Y exists, but in response to a separate FOIA request about Person Z state only that no response could be made, this would give rise to the inference that Person Z is or has been a target. Over time, the accumulation of these inferences would disclose the targets and capabilities, and therefore the sources and methods, of NSA's SIGINT activities and functions, and inform our adversaries of the degree to which NSA is aware of some of their operatives or can successfully exploit particular communications.

29.    NSA cannot respond to each case in isolation, but must assume that our adversaries may examine all released information together. These compilations of disclosed information could reasonably be expected to cause exceptionally grave and irreparable damage to the national security by providing our adversaries a road map that instructs them on which communication modes or personnel remain safe or are successfully defeating NSA's capabilities. Our adversaries could exploit this information in order to conduct their activities more securely, to the detriment of the national security of the United States. Indeed, section 1.7(e) of E.O. 13526 specifically contemplates the danger of such compilations.

30.    Therefore, the NSA must use the *Glomar* response consistently in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including instances in which the NSA does not possess records responsive to a particular request. If the NSA were to invoke a *Glomar* response only when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist. Consistent use of the *Glomar* response is necessary to ensure its effectiveness.

11

31.     The determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

32.     For these reasons, the fact of the existence or nonexistence of intelligence information is a currently and properly classified matter in accordance with E.O. 13526, and thus Plaintiff's request number 81484 was properly denied pursuant to FOIA Exemption 1.

### b. Information About NSA SIGINT Activities is Protected From Disclosure by Statute and Thus Falls Under FOIA Exemption 3

33.     The FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3). Review of the application of Exemption 3 consists solely of determining that the statute relied upon qualifies as an Exemption 3 statute, and that the information withheld falls within the scope of the statute.

34.     The information at issue here falls squarely within the scope of several statutes. Information about NSA's SIGINT efforts directly relates to the Agency's core functions and activities and to intelligence sources and methods. As described above, Congress enacted three statutes to protect NSA's SIGINT efforts from disclosure, including but not limited to the existence and depth of signals intelligence-related successes, weaknesses, and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures

**Camper v. NSA, Case No. 1:18-cv-01794-PWG**          **NSA0016**

and the significance of the loss of valuable intelligence information to national policymakers, combatant commanders, and the IC.

35.     The first of these statutes is a statutory privilege unique to NSA. NSA's statutory privilege is set forth in Section 6 of the National Security Agency Act of 1959 ("NSA Act"), 50 U.S.C. § 3605. Section 6 of the NSA Act provides that **"[n]othing in this chapter or any other law… shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof . . . ."** (Emphasis added). By this language, Congress expressed its finding that disclosure of any information relating to NSA activities is potentially harmful.[4] Section 6 states unequivocally that NSA cannot be compelled by statute to disclose any information with respect to its activities.[5] Further, while in this case the harm would be exceptionally grave, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege, rather, NSA need only to show that the information relates to its activities.[6] To invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls within the scope of Section 6. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

36.     The second applicable statute is 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States, or (ii) obtained by the process of communications

---

[4] The courts have held that the protection provided by this statute is, by its very terms, absolute. *See e.g., Linder v. NSA,* 94 F.3d 693 (D.C. Cir. 1996).

[5] *Hayden v. NSA,* 608 F.2d 1381, 1390 (D.C. Cir. 1979); *see also Larson v. Dep't of State,* 565 F.3d 857, 868 (D.C. Cir. 2009); *Students Against Genocide v. Dep't of State,* 257 F.3d 828 (D.C. Cir. 2001); *People for the American Way Found. v. NSA,* 462 F. Supp. 2d 21, 30 (D.D.C. 2006).

[6] *See Larson,* 565 F.3d at 868.

**Camper v. NSA, Case No. 1:18-cv-01794-PWG**            **NSA0017**

intelligence derived from the communications of any foreign government. The term "communication intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients."

37.     The third applicable statute is the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024. In particular, section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 states that "[t]he Director of National Intelligence shall protect the intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. IC, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute.[7] Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024.

38.     As described above, Congress has enacted these three statutes to protect NSA's SIGINT efforts from disclosure. Given that Congress specifically prohibited the disclosure of information related to NSA's functions and activities, and in particular its communications intelligence activities, as well as the sources and methods used by the IC as a whole, I have determined that NSA's SIGINT activities and functions, and its intelligence sources and methods, would be revealed if NSA confirmed or denied the existence of information responsive to Plaintiff's FOIA request.

39.     Based upon my review, I therefore conclude that the acknowledgment of the existence or nonexistence of intelligence information requested by the Plaintiff is protected from

---

[7] *See CIA v. Sims*, 471 U.S. 159 (1985).

disclosure by statute pursuant to the following three authorities: (1) Section 6 of the National Security Act of 1959, 50 U.S.C. § 3605, because the information concerns the organization, function, and activities of the NSA as described above; (2) 18 U.S.C. § 798, because disclosure would reveal classified information derived from NSA's exploitation of foreign communications; and (3) Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, because the information concerns intelligence sources and methods. For these reasons, acknowledgement of the existence or nonexistence of intelligence information requested by Plaintiff is prohibited by statute and has been properly determined to be exempt from disclosure pursuant to the FOIA. Accordingly, the *Glomar* response is proper based on Exemption 3 of the FOIA, but this same response is also warranted based on Exemption 1, as set forth above.

## V.   NSA'S RESPONSE UNDER THE PRIVACY ACT IN PA CASE 84525

40.    The Plaintiff's PA request provided the following: "I simply want to know exactly what your agency wants with me. I do not need classified information only the criterion that pertains to me." *See* Exhibit D. As mentioned above, NSA conducted a search and initially found no records about the Plaintiff in either its Human Resources ("HR") or Security databases, which indicated that she had not previously applied to or visited the Agency in an official capacity. However, in her letter appealing this finding, the Plaintiff indicated that she had in fact visited the Agency a month prior to the date that the Agency issued its letter stating that it was unable to find any records about her. As a result, when the Agency was adjudicating the Plaintiff's PA appeal, it performed a secondary search ensuring that it encompassed searches of both its HR and Security databases, including the records of the Security Operations Command Center ("SOCC"), which maintains records regarding unauthorized visitors.

15

41.     This secondary search produced eight responsive documents, which were all related to the Plaintiff's May 9, 2016 unauthorized visit to the Agency. As explained in more detail above, three of these documents were produced to the Plaintiff in part and five were withheld in full because they were determined to be exempt from production under the FOIA and the PA.

### a. Information About Internal NSA Activities is Protected From Disclosure by Statute and is Thus Exempt From Disclosure Under FOIA Exemption 3

42.     As described above, Section 552(b)(3) of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3). The statutory provision most relevant to the records withheld in full, and the material redacted from, the PA records in this case is Section 6 of the NSA Act, quoted above.

43.     Three of the documents withheld in full include investigative assessments performed after the Plaintiff's unauthorized visit to NSA, which were done to determine if the Plaintiff posed any ongoing risk to the safety of NSA's workforce. The release of the information in these documents would reveal how the Agency responds to and investigates unauthorized contacts similar to Plaintiff's, which could potentially allow future unauthorized visitors to circumvent current investigative methods and techniques. Therefore, these documents were properly withheld pursuant to the third exemption of the FOIA.

44.     Additionally, information was removed from the two documents provided to the Plaintiff that included NSA employee names, internal NSA law enforcement investigative

16

techniques, and employee signatures. This information was properly withheld pursuant to the third exemption of FOIA.

**b. Information About NSA Police's Law Enforcement Activities Is Protected From Disclosure Under FOIA Exemption 7 and PA Exemption (k)(2)**

45.    5 U.S.C. § 552(b)(7)(e) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information that . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected  to risk circumvention of the law." *See* 5 U.S.C. § 552(b)(7)(e).

46.    5 U.S.C. § 552a(k)(2) exempts from disclosure "investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section." The investigatory material either redacted or withheld from production in this case falls within exemption (k)(2) — as opposed to (j)(2) — because NSA's principal function is not "pertaining to the enforcement of criminal laws."

47.    Four of the documents withheld in full consist of investigative assessments and initiatives that NSA pursued in response to Plaintiff's May 9, 2016 unauthorized visit to the Agency.  These documents were properly withheld pursuant to the seventh exemption of the FOIA and exemption (k)(2) of the PA because they consist entirely of information compiled for law enforcement purposes that would reveal how NSA Police respond to and investigate unauthorized contacts similar to Plaintiff's. Revealing this information could allow future offenders to circumvent the NSA Police's investigative efforts to identify, remove and deter unauthorized visitors with negative intentions.

17

48.     Additionally, some information withheld in the three produced documents was redacted pursuant to the seventh exemption of the FOIA and exemption (k)(2) of the PA. This information encompassed investigative techniques utilized by NSA police officers as well as information obtained from other law enforcement sources. Revealing this information could allow future unauthorized visitors to know what factors NSA police use to assess the risk level of an unsolicited contact. This knowledge could allow future unauthorized visitors to attempt to circumvent NSA Police's detention or lower their assessed risk level. Therefore, this information was properly withheld pursuant to the seventh exemption of the FOIA and exemption (k)(2) of the PA.

### c.  Draft Information is Protected From Disclosure Pursuant to FOIA Exemption 5

49.     5 U.S.C. § 552(b)(5) protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Case law regarding this exemption has established that draft documents can be withheld from production. 5 U.S.C. § 552(b)(5).

50.     In this case, one of the documents withheld in full consisted of a draft NSA Staff Processing Form (SPF) related to the Plaintiff's unauthorized visit to the Agency. This form is unsigned and not finalized by the required parties, and, as a result, it was properly withheld pursuant to the fifth exemption of the FOIA.

## VI.   NSA'S ADDITIONAL SEARCH FOR PA RECORDS

51.     Finally, following the filing of the above-captioned lawsuit, and to ensure that NSA produced all non-exempt PA records to the Plaintiff, it performed another search of its HR and Security databases in December 2018. This search revealed that the Plaintiff visited the

Agency at least one additional time without the proper authorization or credentials to enter the property.

52.    As a result of this additional visit, the Agency located two additional PA records about Plaintiff. Both of these records were determined to contain portions that could be released to the Plaintiff. These records are attached to my declaration as Exhibit J. Information has been removed from these records pursuant to the following FOIA and PA exemptions: 5 U.S.C. § 552(b)(3), (b)(7) and 5 U.S.C. § 552a(k)(2).

> **a.  Information About Internal NSA Activities is Protected From Disclosure by Statute and is Thus Exempt From Disclosure Under FOIA Exemption 3**

53.    As described above, Section 552(b)(3) of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3); *supra* ¶¶ 33-37 and 49. The statutory provision most relevant to the material redacted from these two recently identified PA records is Section 6 of the NSA Act, quoted above. *supra* ¶ 35.

54.    Information was removed from both of these documents that included NSA employee names, employee identification numbers, and internal NSA law enforcement investigative techniques. This information was properly withheld pursuant to the third exemption of FOIA.

> **a.  Information About NSA Police's Law Enforcement Activities Is Protected From Disclosure Under FOIA Exemption 7 and PA Exemption (k)(2)**

**Camper v. NSA, Case No. 1:18-cv-01794-PWG**          **NSA0023**

55.     As described above, 5 U.S.C. § 552(b)(7)(e) and 552a(k)(2) protect certain law enforcement information from disclosure under the FOIA and the PA respectively. *supra* ¶¶ 45-46.

56.     One of the recently identified documents had information removed from it that encompassed information obtained from other law enforcement sources. As explained more fully above, revealing this information could allow future unauthorized visitors to know what factors NSA police use to assess the risk level of an unsolicited contact. Therefore, this information was properly withheld pursuant to the seventh exemption of the FOIA and exemption (k)(2) of the PA. *supra* ¶¶ 47-48.

## VII.   CONCLUSION

57.     In conclusion, based upon my position as the Chief of Policy, Information, Performance, and Exports, the Agency official responsible for the processing of all requests made pursuant to FOIA and the PA, I am confident that NSA's determination in FOIA/PA case 81484 that it could not acknowledge the existence or nonexistence of intelligence information was proper because a positive or negative response to such a request would reveal information that is currently and properly classified in accordance with Executive Order 13526 and protected from disclosure by statute.

58.     I am also confident that NSA produced all non-exempt portions of PA records in response to FOIA/PA case 84525. In fact, in an effort to locate all potentially responsive documents, the Agency performed an additional search of its HR and Security databases to determine if the Agency had any PA records in its systems that had not been previously processed for potential production to Plaintiff. This search produced two additional records that were generated as result of the Plaintiff visiting the Agency for a second time without

authorization after the date of NSA's response to the Plaintiff's appeal. Both of these additional documents were produced to the Plaintiff in part on February 7, 2019.

59.     Finally, after reviewing all of the Plaintiff's correspondence to the Agency in both her FOIA and PA cases, I can confidently say that nothing she said can be construed as requesting any amendments to her PA records.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this __9th__ day of February 2019 pursuant to 28 U.S.C. § 1746.


STEVEN E. THOMPSON
Chief of Policy, Information, Performance,
and Exports
National Security Agency